# UNITED STATES DISTRICT COURT
## Western District of Wisconsin FILED/REC'D

---

Benjamin M. Dykman
    Plaintiff,

**23 CV 217 JDP**

v.

Case No. _____

Board of Regents, University of Wisconsin--Madison
    Defendant.

---

## COMPLAINT

---

## I. NATURE OF ACTION

**101.** This is a civil rights action arising out of the Defendant, through the action of the University's Interim Provost, upholding the revocation of the Plaintiff's Rolling Horizon teaching appointment based on alleged disabilities, and resulting performance problems, the Plaintiff was regarded as having but did not actually have.

**102.** The adverse action committed by the Plaintiff's employer (the University of Wisconsin-Madison) occurred in violation of the ADA Amendments Act of 2008 (**ADA-AA 2008**), Sec. 2 thru 7, which additionally prohibits discrimination against individuals regarded as having, or perceived as having, one or more disabilities. Such an adverse action is often referred to as "Perceived Disability Discrimination".

## 11. JURISDICTION AND VENUE

**201.** Jurisdiction is conferred on this Court by 42 U.S. C. § 12117(a) and 42 U.S.C. § 2000e-5(f)(3).   This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

**202.** The Western District of Wisconsin is the proper venue for this action because it is a judicial district in the State in which the unlawful employment practice is alleged to have been committed within the meaning of 42 U.S.C. § 2000e-5(f)(3).

## 111. PARTIES

### A.  Plaintiff

**301**. The Plaintiff, Benjamin M. Dykman, is a natural person and citizen with the capacity to sue and be sued in this Court.

At the time he was subjected to the adverse action contested in this Complaint, the Plaintiff was "retired", i.e., retired as a result of having been forced into retirement by the Defendant.

## B. Defendant

**302.** The Defendant, Board of Regents of the University of Wisconsin, is the legal entity of the University of Wisconsin-Madison with the capacity to sue and be sued in this court.

It was through the action of Interim Provost Henderson that the Defendant committed the Disability Discrimination being contested in this Complaint.

## IV. ALLEGATIONS OF FACT AS TO ALL CAUSES OF ACTION

**401.** The Plaintiff's employer was the University of Wisconsin-Madison. The Plaintiff was employed there for approximately 20 years, serving as a Visiting Assistant Professor, Lecturer, and Senior Lecturer. . At the time of the adverse action being contested in this Complaint, the Plaintiff held a relatively secure Rolling Horizon **(RH)** teaching appointment.

**402.** Based on the allegation of poor teaching performance, the Plaintiff's **RH** teaching appointment was originally revoked at a Psychology Department Committee meeting (i.e., an "Executive Committee" meeting) held on 3/24/14. The Plaintiff's RH was replaced with a less secure Fixed-Term **(FT)** appointment.

**402(1).** The original Department Committee's decision was appealable. Knowing that his teaching performance was at least acceptable, the Plaintiff followed the University's prescribed sequence of appeals. That sequence ascended up the University's appeal hierarchy.

The Plaintiff's Appeal eventually reached the top of the University's appeal hierarchy, i.e., the Provost's Office.

**402(2).** The Plaintiff's appeal reached the Provost's office at a time of transition between Provosts. It was <u>Interim</u> Provost James Henderson who adjudicated the Plaintiff's appeal. He served as Interim Provost for only about 3 months, rendering his final decision in this case only 5 weeks into his term.

**403.** About midway through the Plaintiff's sequence of Appeals within the University, an audio recording was discovered. The audio recording was anonymously left, with no stated purpose, in the Plaintiff's school mailbox. The Plaintiff first listened to the audio recording in October 2017.

It turned out to be an audio recording of the original Department Committee meeting at which the Plaintiff's RH appointment was revoked.

**403(1).** The audio recording revealed that shortly before the Department Committee voted to revoke the Plaintiff's RH appointment, some members of that Committee had falsely described the Plaintiff as having a number of extreme and shocking disabilities, none of which he actually had. Hence, those were "Perceived Disabilities".

The ADA-AA (2008) refers to someone perceived to have a disability as someone being "Regarded as" having a disability. If a consequential decision accompanies or follows someone being falsely regarded as having a disability, it is a violation of the ADA-AA (2008).

**403(2).** The audio recording revealed that just prior to the Department Committee voting to revoke the Plaintiff's RH,  about 20 baseless disability-imputing comments were cast by Department Committee members. Both mental and physical disabilities were falsely attributed to the Plaintiff.

Adding to their impact, those perceived disabilities were also discussed by Department Committee members as rendering the Plaintiff unable to perform his job duties. That perception further moved Committee members to revoke the Plaintiff's RH thereby rendering the Plaintiff more terminable.

In reality, the Plaintiff had absolutely no disabilities and performed his job well (as supported by accolades described later in this document).

**403(3).** Because Department Committee members barely knew the Plaintiff, with many not knowing him at all, Committee members fell prey to what they were told.

Attesting to the "Perceived Disabilities" being actually believed, the audio recording revealed that not a single Committee member challenged the extreme and shocking, totally false, disabilities attributed to the Plaintiff.

**404.** Upon discovering the audio recording revealing that Department Committee members had falsely attributed disabilities and resulting performance problems to him prior to revoking his RH appointment, the

Plaintiff began a series of appeals contesting the Perceived Disability

Discrimination to which he was subjected.

**405.** The Plaintiff's Appeal eventually reached the top of the University's

appeal hierarchy, i.e., the Provost's Office.

**405(1).** Whereas University decisions prior to the Interim Provost's decision

could be appealed, the Interim Provost's decision was the University's (i.e.,

the Plaintiff's employer's) last and final decision.

**405(2).** <u>Because the Provost's final decision was the University's final</u>

<u>decision, and because that decision was itself replete with violations</u>

<u>of the ADA-AA,  the Provost's  ADA-AA violating decision is the sole</u>

<u>employer decision being contested in this civil action.</u>

**405(3).** Attesting to the finality of the Interim Provost's decision (whose

decision also represented the University's and thus the Plaintiff's

employer's position), the Interim Provost's final decision letter stated that

his decision could not be appealed further within the University. His

decision letter explicitly stated, "*Further review of this matter may only be sought in a venue external to the University*".

**405(4).** Thus, it was not until the Interim Provost's final decision that the consequence of attributing disabilities to the Plaintiff (i.e., the consequence of revoking the Plaintiff's RH) could not be appealed further within the University. The University's decision became final concomitant with the Interim Provost's final decision.

**405(5).** The Interim Provost had the power to reverse prior University decisions. Thus, in addition to the Interim Provost's decision being the University's last and final decision, the Interim Provost's decision was also a freestanding, independent decision.

**406. In addition to the Interim Provost's decision being the University's most recent and final decision, the Interim Provost's final decision letter showed that he engaged in Perceived Disability Discrimination against the Plaintiff to a degree even worse than the original Department Committee had perpetrated it.**

As detailed below, the ADA-violating egregiousness of the Interim Provost's assertions went beyond prior decisions rendered in this case.

**406(1).** The Interim Provost had been provided with a listing of the many blatant disability-imputing comments that were cast just prior to the Plaintiff's RH being revoked.

**406(2).** The Provost was also provided with an audio recording and transcript of the revocation meeting at which those comments were cast.

**406(3).** Confronted with the egregious disability-imputing comments in their entirety, both visually and auditorily, in violation of the ADA-AA the Interim Provost did not at all acknowledge the false disabilities attributed to the Plaintiff and upheld the prior disability-based revocation of the Plaintiff's RH.

**406(4).** In violation of the ADA-AA, the Department Committee's casting of a multitude of shocking and extreme, totally baseless, mental and physical disability-imputing comments was ignored by the Interim Provost.

**406(5).** Examples of comments ignored by the Interim Provost are, "*he has suffered neurological damage and that has to be part of the problem*"; *we know he has some neurological difficulties in regard to teaching, he probably is not in the position to be able to prep a new course*".

**406 (6).** Even though about 20 such completely false disability-imputing statements had been cast by Department Committee members, the Interim Provost's denial was dogmatic, with the Provost categorically stating, "*there is nothing in the recording that demonstrates that the action of removing your Rolling Horizon appointment was based on perceived disability*".

**407.** The Interim Provost's decision letter also indicates that the disabilities attributed to the Plaintiff played a CAUSAL role in the Provost's decision-making.

**407(1).** In his decision letter the Interim Provost ended up justifying the revocation of the Plaintiff's RH largely based on alleged characteristics that were offshoots of the disabilities the Plaintiff was falsely perceived as having.

**407(2).** For example, one alleged factor mentioned by the Provost as justifying the revocation of the Plaintiff's RH was "*low course enrollments*".

Low course enrollment was exactly what the original Committee falsely attributed to a head injury caused by a bicycle accident the Plaintiff had.

**407(3).** The alleged connection between the head injury and drop in enrollment was preposterous given that the bike accident occurred about 5-6 years prior to the drop in enrollment, with a benign course scheduling change (changing the start of the class from 2:30pm to 4:30pm) being totally overlooked.

**407(4).** Overall, had the original Department Committee not falsely attributed an alleged inability to teach to the head injury, and had other similar false disability attributions not been made, the Interim Provost would not have had a pretext for justifying the RH revocation.

**408.** In violation of the ADA-AA, The Interim Provost's final decision letter showed a gross denial of the about 20 disability imputing remarks to which the Plaintiff was subjected.

**408(1).** That is, the Interim Provost was provided with abundant evidence showing that the Plaintiff had been 1) falsely characterized as physically and mentally disabled by Department Committee members and 2) falsely characterized as unable to perform his job as a result.

Further, as shown in ¶¶409-409(4) of this Complaint, the Interim Provost was provided with evidence indicating that those false characterizations had moved Committee members to revoke the Plaintiff's RH.

**408(2).** Despite the Interim Provost acknowledging that he reviewed the relevant materials provided by the Plaintiff, the Provost's final decision revealed a failure to condemn, or even acknowledge, the blatant and flagrant Perceived Disability Discrimination to which the Plaintiff had been subjected.

For example, the Interim Provost neither mentioned nor grappled with the Plaintiff being falsely described by Committee members as "*neurologically damaged*" and unable to prepare new course material as a result.

Accompanying the Interim Provost's egregious failure to acknowledge the mental and physical disability-imputing remarks cast at the Department Committee meeting, the Interim Provost failed to reverse the wrongful revocation of the Plaintiff's RH.

Apparent throughout the Provost's reasoning were his blind, wrongful, dogmatic assertions that 1) "*the ADA is not applicable in this instance*" and 2) "*there is nothing in the recording that demonstrates that the action of removing your Rolling Horizon appointment was based on perceived disability*".

**The above ADA-violating egregious combination of statements is beyond what has ever occurred in the entire history of this case. More generally, if left uncorrected, it would set a harmful precedent.**

**408(3).** Meeting Wisconsin's 300-day Statute of Limitations (**SOL**) deadline, it was soon after the Provost's final decision that the Plaintiff turned to a State Court, i.e., the Wisconsin Equal Rights Division (**WERD**), which has exclusive jurisdiction over discrimination claims in Wisconsin.

The Provost's ADA-AA-violating decision was highlighted in the Perceived

Disability Discrimination claim the Plaintiff's submitted to the WERD.


**409.** The Provost's complete denial of the disability-attributing remarks

contained on the audio recording is sharply at odds with Department

Committee member's own comments in the aftermath of the Committee

meeting.


Department Committee member's own comments showed how impactful

the disability imputing comments were, with Committee members even

admitting that one or more such comments affected the Committee's

decision making, as shown below.


**409(1).** Shortly after the Plaintiff's RH was revoked a Senior Department

member (who later became Chair) patently admitted that at least one false,

disability-imputing  comment (i.e., *Ben is very violence-prone*")  influenced

the revocation of the Plaintiff's RH.

Being greatly disturbed by the false comment, that Committee member sent out a Committee-wide email stating that the ["*Ben is very violence prone*"] comment "*carried enormous weight*".

Believing that the "[*Ben is very violence-prone*]" comment "*carried enormous weight*" in the Committee's decision to revoke the Plaintiff's RH, he suggested holding another meeting to revisit the revocation of the Plaintiff's RH.

**409(1A).** The Chair, who originally threatened the Plaintiff with dismissal, reacted strongly to the Committee member's motion to revisit the revocation of the Plaintiff's RH.

Attesting to the decisive impact of the "*Ben is very violence-prone*" comment,  the Chair sent Committee members a misleading email falsely reversing when the comment and the vote occurred. She falsely and egregiously claimed that the "[Ben is very violence prone]" comment occurred after the vote was taken. By doing this she protected her wish to be rid of the Plaintiff by strongly implying that the comment could not have affected the vote.

**409(1B).** The later discovery of the taped evidence incontrovertibly belied the Chair's claim. In fact, the comment claimed by the Committee member to have "enormous impact" occurred 18 minutes prior to the vote. Its impact could not be denied!

**409(2).** Also attesting to the strong impact of the comment, another Committee member reported being "*rattled*" by the "*Ben is very violence prone*" comment.

**409(3).** Yet another Department member's email stated, "*the comments made about Ben at this meeting were highly inappropriate, to say the least*".

**409(4).** Unfortunately, the Chair's action of falsely misrepresenting when the comment occurred was successful. The Chair's misrepresentation blocked Committee members from revisiting and reconsidering the revocation of the Plaintiff's RH.

**410.** The Interim Provost's wrongful denial of the false disability-attributing remarks to which the Plaintiff was subjected, and his denial of their impact on the decision-making of the original Committee (as shown in ¶¶409-409(4) of this document), left him without justification for removing the Plaintiff's RH.

The Interim Provost thus attempted to misleadingly justify the revocation of the Plaintiff's RH on the basis of alleged teaching performance problems.

**410(a).** The Interim Provost's final decision letter shows that he based his allegation of teaching performance problems on comments contained on the audio recording of the original RH revocation meeting.

**410(b).** However, as shown below, strongly negatively biased data were presented at the Department Committee meeting at which the Plaintiff's RH was revoked. The Committee meeting data the Provost drew upon in making his final decision was grossly erroneous.

**410(c).** As is also shown below, no performance problems existed which warranted the revocation of the Plaintiff's RH.

**410(d).** Overall, as shown below, the Provost's allegation of poor teaching performance was baseless.

Examples strongly contradicting the existence of performance problems that would warrant RH revocation are these facts:

**410(d-1).** Violating the University stipulation that Executive Committee evaluations "*shall be performed in an impartial manner*"( FPP5.21), the Committee which originally revoked the plaintiff's RH was presented with highly negatively biased performance data.

For example, there was no mention of the Plaintiff's most positively evaluated courses.

Moreover, out of the thousands of students enrolled in the Plaintiff's classes over the years, 48 "troubling comments" were selectively cherry-picked and presented at the original Committee meeting.

The Plaintiff's own review of negative comments he received revealed that most of those students still rated the Plaintiff as an effective or very effective teacher.

**410(d-2).** Totally contradicting the allegation of teaching performance problems is the fact that the Plaintiff's teaching load and salary were both increased soon after the Appointment revocation, with those increases occurring with no change in the Plaintiff's teaching performance.

**410(d-3).** Course evaluations submitted by students in the Plaintiff's classes were very positive.

**410(d-4).** Highly positive teaching reviews were submitted by "first-hand-witnesses" (i.e., Teaching Assistants) and by a former Chair who lauded the Plaintiff's teaching in advocating a job promotion for the Plaintiff.

**410(d-5).** The plaintiff received an "Honored Instructor Recognition" award prior to the RH revocation and then received another such teaching award soon after the RH revocation.

**410(d-6).** All annual teaching reviews the Plaintiff received indicated at least acceptable performance, with no annual teaching reviews indicating that the Plaintiff's teaching appointment was in jeopardy.

**410(d-7).** Showing a complete lack of concern regarding the Plaintiff's teaching performance, across the Plaintiff's almost 17 years of teaching (up until the original Committee meeting in 2014) only 5 annual teaching reviews were ever submitted.

**410(d-8).** Regarding the 12 missing annual reviews, UW Academic Staff Policies and Procedures (ASPP) states, "*Absent a review document in an employee's personnel file, it shall be assumed that the employee's performance has been at least satisfactory*".

**410(d-9).** The most negative, but still acceptable, teaching review the Plaintiff ever received was emailed to him soon after the Chair (P. Devine) had discovered that the Plaintiff had collected data which challenged the Department's abusive practice of using class time for faculty's own research.

Indicating that the writing of that more negative review was ad hoc, that review was written by the Chair's close colleague (J. Harackiewicz) and, very oddly, was based on a Teaching Committee meeting which had occurred 10 months prior to when the review was dated and mailed.

**411.** In addition to University records showing the absence of performance problems on the part of the Plaintiff, quotations on the audio recording of the original RH revocation meeting revealed faculty basically admitting to a need to use "performance problems" as a pretext for revoking the Plaintiff's RH teaching appointment.

**412. Given that the Plaintiff's teaching performance was clearly adequate and that all of the physical and mental disabilities attributed to him were false, the original Committee voting to revoke the Plaintiff's RH appointment is very puzzling.**

**The evidentiary background to this case provides the answer.**

**412(1).** Six weeks prior to the Department Committee meeting at which the Plaintiff's RH was revoked, the Plaintiff explored whether students'

educational and research participation rights were being violated. In particular, faculty were wrongfully having students complete faculties' research during class time.

**412(2).** The Plaintiff's interest in protecting students' rights was supported by University policy.

**412(3).** The data the Petitioner collected indicated that many students viewed participating in faculty member's research during class time as less educationally useful than regular lecture, and as not completely voluntary.

**412(4).** Soon after the Plaintiff had collected this troubling data, the Department Chair attempted to bullyingly confiscate it. Specifically, the Chair threateningly demanded that he relinquish the data he collected.

The Chair's letter specifically stated that the Plaintiff's refusal to relinquish his data would render him subject to *"disciplinary action up to and including dismissal"*.

**412(5).** Given University guidelines encouraging faculty and staff to protect students' rights, the Plaintiff did not relinquish his data.

**412(6).** Six week after issuing her threatening letter, the Chair implemented the "disciplinary action" she previously threatened. The Chair, in conjunction with her close colleague (Associate Chair Harackiewicz), orchestrated an "Executive Committee" meeting at which the Plaintiff's RH teaching appointment was revoked and replaced with a less secure Fixed-Term **(FT)** appointment.

**412(7).** As discussed earlier, the pretext for the revocation of the Plaintiff's RH was poor teaching performance.

**413.** As teaching performance grounds warranting revocation were lacking, Committee leaders imputed totally baseless, but emotionally moving, physical and mental disabilities to the Plaintiff.

Moreover, Committee leaders described these alleged disabilities as allegedly impairing the Plaintiff's ability to fulfill his job responsibilities, in this way attempting to further justify revoking his RH.

**413(1).** Committee leaders, particularly the Chair and Associate Chair, were especially driven to eliminate the threat the Plaintiff posed to faculties' misuse of class time for collecting their own research data.

**413(2).** The Chair's and Assoc. Chair's drive to eliminate the threat the Plaintiff posed is evidenced by blatant procedural violations the Chair and Assoc. Chair committed.

For example, Faculty policy (FPP 5.11) dictates that EC meetings should follow procedures prescribed by Robert's Rules of Order. One such Rule of Order is that Chairs who head such a meeting should remain impartial and not express a view that clearly favors either side. Chair Devine instead expressed 4 separate personal opinions that were groundless and clearly negatively biased against the Plaintiff.

**413(3).** In this same vein, Associate Chair Harackiewicz made an impartial coercive statement which pressured the Executive Committee to act "*today*", resulting in a rush-to-judgment.

Specifically, the Associate Chair stated, *"...If we don't do this today I'll be resigning as Associate Chair..."*.

**413(4).** Such unfairness had become the Department's modus operandi. In 2 other cases, an independent University Committee strongly criticized the Psychology Department Executive Committee for conducting unfair faculty evaluations.

**414.** The Interim Provost was provided the evidentiary background information above. The Interim Provost was thus fully aware that the original Department Committee had flagrantly violated the University stipulation of conducting an impartial evaluation. The Interim Provost was thus in a position to acknowledge and grapple with the original Committee's false assertions and impartiality.

However, just as the Interim Provost denied the flagrant Perceived Disability Discrimination which occurred, he attempted to promote his own justification for revoking the Plaintiff's RH by similarly ignoring the fact that the data presented to members of the original Committee meeting was cherry-picked negative data.

In writing his final decision, he uncritically drew upon the original

Committee's discussion of "facts and data" regardless of being explicitly

informed of the falseness of those "facts and data".

### 415. The But-For Causation Standard applies to this case.

The Plaintiff's RH teaching appointment would not have been revoked BUT

FOR the Perceived Disability Discrimination to which he was subjected.

**415(1).** As described earlier, the alternative explanation alleged by the

Interim Provost (i.e., his allegation of teaching performance problems) was

groundless. Perceived Disability Discrimination accounting for the

revocation of the Plaintiff's RH  is the only remaining viable explanation.

Indeed, quotations from Committee members themselves basically

revealed that teaching performance problems only served as a pretext for

the RH revocation.

**415(2).** In contrast to the groundlessness of alleged teaching performance problems is strong evidence that the mental and physical perceived disabilities attributed to the Plaintiff strongly motivated Committee members to want to rid themselves of the Plaintiff.

Hearing that an employee was "*very violence prone*" and unable to perform his job duties would negatively affect nearly every employer's (and reasonable person's) evaluation of an employee.

The ADA requires the reversal of adverse decisions based on false disability information.

**415(2a).** However, in violation of the ADA, failure to reverse a wrongful disability-based decision is exactly what the Interim Provost did.

The Interim Provost stated, "*I have reviewed* [the Plaintiff's] *letter and supporting documentation*". Despite thus having full knowledge of the baselessness of the original Committee's allegations, the Provost nevertheless categorically denied that the plethora of disabilities attributed

to the Plaintiff was key to the Committee's decision to revoke the Plaintiff's RH.

The Provost's categorical, blind denial of the Perceived Disability Discrimination which occurred is evidenced by the Provost saying,

> *"There is nothing in the recording that demonstrates that the action of removing your Rolling Horizon appointment was based on perceived disability".*

**415(3).** The "But-for" Causation Standard was also directly supported by the fact that accommodation was rejected due to the alleged neurological impairment.

The impact of the disabilities attributed to the client was so strong that when an alternative to revoking the Plaintiff's RH was proposed, that alternative (accommodation) was rejected with a disability-based response.

**415(3-a).** Specifically, an alternative (a "*work-around*") to revocation was proposed by one Committee member. That alternative consisted of accommodating the Plaintiff by giving him new courses to teach.

**415(3-b).** That alternative to RH revocation (i.e., accommodation) was rejected with this disability-based response:

> "*we know he has some neurological difficulties in regard to teaching, he probably is not in a position to be able to prep a new course…it would be better to… **not try to do these workarounds**….it would be kinda mean to be forcing someone to do something we knew that they… **probably couldn't do**".* (my emphasis).

**415(4).** The above disability-based "[probably couldn't do it]" rejection of an alternative to revocation made RH revocation seem all the more imperative to the Department Committee.

Attesting to the believability of the "[probably can't do it]" rejection of accommodation, not a single Committee member questioned the "[probably couldn't do it]" rejection of accommodating the Plaintiff with new courses to teach.

The groundless "probably couldn't do it" mindset of Committee members implied that retention of the Plaintiff would have very limited utility. This

moved Committee members even further in the direction of revoking the

Plaintiff's RH.

In actuality, records show that following the revocation the Plaintiff taught

new courses that students rated very highly.

**415(5).** Overall, revocation of the Plaintiff's RH would not have occurred

"but for" the false disabilities imputed to the Plaintiff.

## V. BASIS OF LIABILITY

This adverse  action committed by the Plaintiff's employer (the University of

Wisconsin-Madison) occurred in violation of the ADA Amendments Act of

2008, Sec.2-7, which additionally prohibits discrimination against

individuals regarded as having,  or perceived as having, one or more

disabilities.

## VI. DAMAGES AND EQUITY

## A. Compensatory Damages.

**601.**  By virtue of the unlawful actions of the Defendant, Plaintiff Benjamin

Dykman suffered much emotional pain and monetary loss for which he

seeks compensation in an amount deemed just by the Court. It is asked

that the Court consider these factors:

## B. Equitable Relief

**601(1).** In recognition of the fact that his RH appointment had been

wrongfully revoked, the Petitioner asks for a resumption of his RH

appointment. Such a resumption would formally acknowledge his original

rightful position and enable him to resume the teaching career he very

much enjoyed.

**601(2).** The Petitioner asks the University to retract all allegations of

behavior problems and disabilities he was falsely described as having. That

retraction must acknowledge that he is neither aggressive nor physically

dangerous, that he is not neurologically impaired, and that his

performance as an instructor was and is acceptable.

**601(3).** Petitioner asks the court to grant further relief as the Court deems

just and equitable, e.g., copying costs, complaint submission costs,

attorney fees, lost interim wages, mental anguish.

## VII. CONDITIONS PRECEDENT

701.   All conditions precedent to this action within the meaning of Rule 9(c), Fed. R. Civ. Pro., have been performed or have otherwise occurred.

## VIII. REQUEST FOR TRIAL BY JURY

801. The Plaintiff requests trial by jury.

## IX. PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays the court to grant a judgment against the Defendant awarding him damages, costs, attorney fees and such other and further relief as the Court deems just.

Respectfully submitted,

*Benjamin Dykman*

Benjamin Dykman, Plaintiff
April 8, 2023

Submitted Pro Se